UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the matter of the Arbitration between<br><br>BRODY SIMPSON,<br><br>        Petitioner,<br><br>v.<br><br>PELOTON INTERACTIVE, INC.,<br><br>        Respondent. | Case No.<br><br>**PETITION TO CONFIRM ARBITRATION AWARD** |

Petitioner Brody Simpson ("Simpson") respectfully petitions this Court, pursuant to 9 U.S.C. § 9, for an Order confirming the arbitration award issued by the American Arbitration Association in the claim of *Brody Simpson v. Peloton Interactive, Inc.*, AAA Case No. 01-19-0002-5422.

### I.  NATURE OF THE ACTION

1.  Simpson initiated a demand for arbitration against Respondent, Peloton Interactive, Inc. ("Peloton"), with the American Arbitration Association, pursuant to an arbitration provision contained within Peloton's Terms of Service, which the parties agreed to in connection with Simpson's purchase of a Peloton exercise bike and subscription to Peloton's library of live and on-demand classes.  A copy of Peloton's Terms of Service is attached as Exhibit A hereto.

2.  Simpson claimed that Peloton advertised that its subscription-based fitness service included access to an "ever-growing" library of on-demand classes, but that Peloton knew or should have known: (1) that it lacked the appropriate copyright licenses for the music accompanying the classes in its library; and (2) that its library could not legitimately be "ever-growing." Simpson claimed these misrepresentations and omissions harmed him, in violation of

Kansas law,[1] and sought statutory damages of $10,000 per violation, attorneys' fees, interest, costs, punitive damages, and injunctive relief.

3. Following discovery, an arbitration hearing was held on April 29, 2020, wherein both parties were afforded full opportunity to call, examine, and cross-examine witnesses, introduce documentary evidence, and present arguments. Following the hearing, the parties submitted post-hearing briefing on the merits and then additional briefing on Simpson's attorney's fee application. On August 25, 2020, the Arbitrator issued a final award awarding Simpson $253.50 in damages, $96,597.00 in attorneys' fees, and $7,917.82 in costs against Peloton.

4. In its assiduously reasoned Interim Award (a copy of which is attached as Exhibit B hereto), the Arbitrator considered the full value of Simpson's Peloton Membership of $39 per month and concluded that Peloton's false and misleading advertisements and representations deprived Simpson of the full value of his membership for ▮▮▮▮▮▮ for which Peloton's advertisements and representations were demonstrably false—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[2] In its Final Award (a copy of which is attached as Exhibit C hereto), the Arbitrator likewise conducted a thorough analysis of Simpson's attorneys fees and costs before concluding counsel was entitled to $96,597.00 in attorneys' fees and $7,917.82 in costs from Peloton.

---

[1] Although Peloton's "Terms of Service" contains a governing law clause mandating that New York law governs, in all respects, the relationship between Peloton and each of its subscribers (*See* Exhibit A at ¶ 22 – "Governing Law"), the parties to the *Simpson* arbitration affirmatively deviated from those uniform governing law terms by stipulating that Kansas substantive law would apply in the context of that arbitration.

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

5. Section 9 of the Federal Arbitration Act provides that, "If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9.

6. The parties' arbitration agreement states: "Judgment on the award rendered by the arbitrator may be entered in any court having competent jurisdiction." Exhibit A at 18.

7. Accordingly, Petitioner seeks an Order from this Court confirming the Arbitration award and an entry of Judgment against Peloton.

## II.   PARTIES

8. Petitioner, Brody Simpson, is a citizen of Kansas who purchased a Peloton Bike, a 39-month subscription to Peloton's "ever-growing" library of on-demand classes, and an accessory package for $4,485.87 on July 6, 2018.

9. Respondent, Peloton Interactive, Inc, is a Delaware corporation, with its corporate headquarters and principal place of business located in New York City. Peloton may be served with process at its principal executive office, located at 125 West 25th Street, Eleventh Floor, New York, New York.

10. Peloton markets and sells its apparel, hardware accessories, hardware, and subscription service throughout the United States, including in this District. Peloton is registered to conduct business in New York.

## III.   JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of

interest and costs.

12.     The Court has personal jurisdiction over Peloton because it resides and is subject to general jurisdiction in this District.  The Court also has personal jurisdiction over Peloton, because it markets, distributes, and sells its apparel, hardware, accessories, and Subscription Service throughout the United States, including in this District, and the conduct underlying Simpson's arbitration demand occurred in or was targeted at this District.

13.     Venue is proper in this District because Peloton resides in this District and a substantial part of the events or omissions giving rise to Simpson's claims occurred in this District. 28 U.S.C. § 1391(b)(1)-(2).

### IV.     PELOTON'S ARBITRATION CLAUSE

14.     Peloton's Terms of Service contain an arbitration clause.  It provides:

**20. ARBITRATION CLAUSE & CLASS ACTION WAIVER – IMPORTANT – PLEASE REVIEW AS THIS MAY AFFECT YOUR LEGAL RIGHTS. APPLICABLE TO THE FULL EXTENT PERMITTED BY LAW.**

a) <u>Mandatory Arbitration of Disputes</u>. We each agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content (collectively, "Disputes") will be resolved **solely by binding, individual arbitration and not in a class, representative or consolidated action or proceeding**. You and Peloton agree that the U.S. Federal Arbitration Act (or equivalent laws in the jurisdiction in which the Peloton entity that you have contracted with is incorporated) governs the interpretation and enforcement of these Terms and that you and Peloton are each waiving the right to a trial by jury or to participate in a class action. This arbitration provision shall survive termination of these Terms.

b) <u>Exceptions and Opt-out</u>. As limited exceptions to Section 20(a) above: (i) you may seek to resolve a Dispute in small claims court if it qualifies; and (ii) we each retain the right to seek injunctive or other equitable relief from a court to prevent (or enjoin) the infringement or misappropriation of our intellectual property rights. In addition, **you will retain the right to opt out of arbitration entirely and litigate any Dispute** if you provide us with written notice of your desire to do so by regular mail sent to the attention of Peloton's Legal Department at the Peloton address set out below within thirty (30) days following the date you first agree to these Terms.

c) <u>Conducting Arbitration and Arbitration Rules</u>. The arbitration will be conducted by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules (the "AAA Rules") then in effect, except as modified by these Terms. The AAA Rules are available at www.adr.org or by calling 1-800-778-7879. A party who wishes to start arbitration must submit a written Demand for Arbitration to AAA and give notice to the other party as specified in the AAA Rules. The AAA provides a form Demand for Arbitration at www.adr.org.

If your claim is for U.S. $10,000 or less, you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic or video-conference hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds U.S. $10,000, the right to a hearing will be determined by the AAA Rules. Any arbitration hearings will take place in the county (or parish) where you live, unless we both agree to a different location. The parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of this arbitration agreement.

d) <u>Arbitration Costs</u>. Payment of all filing, administration and arbitrator fees will be governed by the AAA Rules. Peloton will pay for all filing, administration and arbitrator fees and expenses if your Dispute is for less than U.S. $10,000, unless the arbitrator finds your Dispute to be frivolous. If we prevail in arbitration, we will pay all of our attorneys' fees and costs and won't seek to recover them from you. If you prevail in arbitration you will be entitled to an award of attorneys' fees and expenses to the extent provided under applicable law.

e) <u>Class Action Waiver</u>. **YOU AND PELOTON AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING**. Further, if the parties' dispute is resolved through arbitration, the arbitrator may not consolidate another person's claims with your claims and may not otherwise preside over any form of a representative or class proceeding. If this specific provision is found to be unenforceable, then the entirety of this Section 20 shall be null and void.

f) <u>Effect of Changes on Arbitration</u>. Notwithstanding the provisions of Section 25 "Modification", if Peloton changes any of the terms of this Section 20 after the date you first accepted these Terms (or accepted any subsequent changes to these Terms), you may reject any such change by sending us written notice within 30 days of the date such change became effective, as indicated in the "Last Updated" date above or the date of Peloton's email to you notifying you of such change. By rejecting any change, you are agreeing that you will arbitrate any Dispute between you and Peloton in accordance with the terms of this Section 20 as of the date you first accepted these Terms (or accepted any subsequent changes to these Terms).

g) <u>Severability</u>. With the exception of any of the provisions in Section 20(e) above, if an arbitrator or court of competent jurisdiction decides that any part of these Terms is invalid or unenforceable, the other parts of these Terms will still apply.

Exhibit A at 18.

## V. FACTUAL BACKGROUND

**A. Peloton's "Ever-Growing" On-Demand Library Claim Is Essential To Its Business Model.**

15. Peloton is an exercise equipment and media company that was founded in 2012. John Foley, its co-founder and CEO (hereafter "Foley"), describes Peloton as a "fitness platform" where "fitness meets technology, meets media."[3] Peloton claims that it "is reinventing fitness with live & on-demand boutique studio classes you can take anytime with the Peloton Bike, Peloton Tread & Peloton digital."[4]

16. Peloton's business initially started with its Peloton Bike, which offers live streaming and on-demand "spinning" classes from the comfort of consumers' homes. "Spinning" classes are popular indoor cycling instruction classes, initially popularized in the mid-1990s, that consist of professional coaches providing real-time instruction, guidance, and encouragement to riders, over a soundtrack of popular and other songs. Peloton has recently expanded this concept of interactive instructional fitness classes, over soundtracks of popular music, to Peloton Tread and other weightlifting, strength training, outdoor running, yoga, meditation, stretching, and cardio-fitness classes.

17. In 2014, Peloton released its eponymous stationary exercise bike, at a price of $2,245. The bike includes a 22-inch interactive touchscreen, which allows riders to watch live or

---

[3] *See* http://media.licdn.com/embeds/media.html?src=https%3A%2F%2Fwww.youtube.com%2Fembed%2FFWXadxuOuSQ%3Ffeature%3Doembed&url=https%3A%2F%2Fwww.youtube.com%2Fwatch%3Fv%3DFWXadxuOuSQ&type=text%2Fhtml&schema=youtube (last accessed September 14, 2020).

[4] *See* https://twitter.com/onepeloton (last accessed September 14, 2020).

pre-recorded classes, aiming to provide the experience of a spin class from the comfort of the users' homes.

18. In January 2018, Peloton announced the release of its treadmill, known as "Tread," for $4,295. Similar to its stationary bike, Tread has a 32-inch interactive touchscreen, which allows runners to watch live or pre-recorded classes led by professional trainers.

19. For consumers who purchase Peloton's hardware, Peloton offers its Peloton Membership, which, in addition to its live and on-demand fitness classes, includes Connected Fitness options such as instructor-curated training programs, live workout metrics, a detailed workout performance dashboard, and live and on-demand class interactive leaderboards. Peloton Membership subscribers pay $39 per month for this service. Peloton refers to customers who purchase the Peloton hardware and corresponding Peloton Membership as "Connected Fitness Subscribers."

20. Recognizing the limited opportunity for growth due to a crowded market space and the high price point of its hardware, in July 2018 Peloton released Peloton Digital, which provides subscribers access to the same live and on-demand fitness classes without having to purchase Peloton hardware. Peloton Digital members pay $19.49 per month for this service.[5]

21. Peloton Digital allows Peloton to market its Subscription Service to consumers who already have a (non-Peloton) treadmill or stationary bike as well as those who prefer to use Peloton's outdoor, free weight, yoga, and other fitness classes. The content that Peloton provides through its Peloton Membership and Peloton Digital subscriptions are coextensive and include the same live and on-demand fitness classes.[6] Because the Peloton Digital app does not provide

---

[5] *See* https://www.bizjournals.com/newyork/news/2018/08/03/peloton-ceo-were-becoming-a-media-company.html (last accessed September 14, 2020).

[6] *Id.*

Connected Fitness options and the integrated experience with Peloton hardware, the appeal of the Peloton Digital app is its "ever-growing" on-demand library of fitness classes.

23. Peloton differentiates itself and its more expensive fitness hardware from other fitness companies by offering unlimited access to its "ever-growing" on-demand library of professional fitness classes available at subscribers' convenience.

**B.     Peloton's "Ever Growing" On-Demand Library Is Central to Its Marketing**

23. While other fitness companies market and sell similar fitness hardware for in-home use, provide in-studio classes where users pay on a per class basis, and home workout programs, Peloton has dominated the marketplace by aggressively marketing access to its "ever-growing" library of fitness classes led by professional instructors, available on-demand 24 hours per day, 7 days per week, from the comfort of the users' own homes for a flat monthly subscription fee.

24. The "ever-growing" nature of Peloton's on-demand library is central to its marketing, because Peloton must ensure that consumers spending thousands of dollars on the Peloton Bike or Peloton Tread and accompanying subscriptions will be able to take and retake older classes without running out of new classes over time. Likewise, Peloton must ensure that Peloton Digital subscribers will have enough new classes in each workout category to keep subscribers renewing their subscriptions.

25. Until recently, Peloton's website prominently touted its "thousands of boutique classes," and "ever-growing library of live and on-demand studio classes."[7] Its website likewise represented that its Subscription Service grants "unlimited access to a growing library of live

---

[7] https://www.onepeloton.com/digital (as of Apr. 25, 2019); *see also* https://www.onepeloton.com/bike/classes
("Thousands of On-Demand Rides. Take a class anytime, with our daily-updated, extensive on-demand library"); *id.* ("Thousands of rides on-demand. Rider anytime with thousands of classes to choose from on-demand.").

streaming and on-demand classes, scenic rides, real-time performance tracking, and unlimited accounts for family and friends. No classes offered by Peloton are off limits."[8]

26. Peloton's promise of an "ever-growing" on-demand library of classes drives sales of not only monthly subscriptions, but also its flagship Peloton Bike and Peloton Tread products.

27. The size and "ever-growing" nature of Peloton's on-demand digital library has always been, and continues to be, central to Peloton's marketing,[9] because "the hardware is only as good as the app and subscription that comes with it."[10]

28. Simpson financed the purchase of a Peloton Bike, a 39-month subscription, and an accessory package for $4,485.87 on July 6, 2018, in reliance on Peloton's representations that its library was "ever growing."

**C.    Peloton Knew That Its "Ever Growing" and "Growing" On-Demand Library Claims Were False And Misleading**

29. Peloton is a sophisticated, multi-billion dollar company that specializes in providing consumers with digital content that is protected by various intellectual property laws. Peloton therefore knew or should have known that it was building its on-demand library with infringing songs, violating applicable copyright laws.

30. Peloton fully understands what the copyright law requires, having entered into sync licenses with certain other copyright holders, while, at the same time, using other musical works for free and without permission.[11] Peloton's knowing violation of copyright laws was part of "a

---

[8] *See* https://support.onepeloton.com/hc/en-us/articles/201039338-Rides-included-with-the-Peloton-subscription.

[9] *See* https:///onepeloton.com/bike/classes (last accessed Dec. 6, 2019).

[10] *See* https://www.forbes.com/sites/bizcarson/2019/09/26/peloton-ceo-john-foley-faces-the-skeptics-again-this-time-buyers-in-its-8-billion-ipo/#3b8f0f6f4349 (last accessed September 14, 2020).

[11] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, ¶ 1 (S.D.N.Y. September 27, 2019).

9

strategy to build a music-centric brand that is now worth in excess of $6 billion" without having to pay for all the required licenses.[12]

31. On April 9, 2018, Peloton was put on actual notice of its copyright infringement when it received a cease and desist letter from the NMPA notifying it of copyright infringement claims for Peloton's failure to receive proper licenses for many of the songs playing in its on-demand fitness classes.

32. Notwithstanding that fact, Peloton continued to promise an "ever-growing" on-demand class library to consumers and to heavily market that fact to its customers and prospective customers as a key Peloton selling point.

33. Implicit in Peloton's promise to provide an "ever-growing" on-demand library was that it would only place classes in the library that complied with applicable copyright law or that it would pay back damages to copyright holders to ensure that the size of the on-demand library would not shrink.

34. On March 25, 2019, in contravention of its promise, Peloton abruptly removed more than half of its on-demand classes from its digital library.[13]

35. Prior to March 25, 2019, Peloton's Subscription Service had more than ▮ on-demand classes available for its users. Exhibit B at ¶ 33. Following Peloton's announcement, Peloton removed ▮ classes from its library. Exhibit B at ¶ 34. Thus, Peloton's abrupt removal of the infringing soundtracks decimated its Subscription Service's on-demand digital library.[14]

---

[12] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 90, at 1 (S.D.N.Y. Oct. 25, 2019).

[13] *See Downtown Music Publishing LLC, et al. v. Peloton Interactive, Inc.*, No. 1:19-cv-02426-DLC, ECF No. 31, Counterclaims ¶ 59 (S.D.N.Y. Apr. 30, 2019); *see also id.*, Counterclaims ¶¶ 10, 42, 46, 52, 57.

[14] *See* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider (Mar. 27, 2019, 10:30 a.m.),

36. After Peloton's purge of that huge number of on-demand classes from its on-demand library, the number of available on-demand classes was roughly equal to the number of on-demand classes that were available to consumers in ▇▇▇▇▇▇▇. Accordingly, contrary to its representations, Peloton's on-demand library, rather than being "ever-growing," was actually materially shrinking.

37. Music is a central component of Peloton's workout classes and Peloton has deeply integrated music into its Subscription Service's interface—allowing users to search for workouts by music genre, as well as artist-specific playlists. Users can also preview playlists for specific classes, "like" songs or playlists during their workouts, and save songs and playlists to their user profile. Music is thus critical to consumers' use and enjoyment of the hardware and Subscription Service.

38. The copyright infringement lawsuit and Peloton's subsequent purge of its on-demand library has also significantly decreased the quality and quantity of popular artists and songs available on Peloton's workout class playlists, which has materially diminished subscribers' experience with the hardware and Subscription Service.[15] The infringing works include some of the most popular artists and songs, both currently and of all time. Peloton has removed songs by a wide array of popular artists including, without limitation, Beyoncé, Brittany Spears, Michael Jackson, Ariana Grande, Snoop Dogg, Dr. Dre, Katy Perry, Rihanna, Miley Cyrus, Motley Crue, Pink Floyd, Justin Bieber, David Bowie, Rascal Flatts, Bruno Mars, Selena Gomez, Maroon 5,

---

https://www.businessinsider.com/peloton-removes-classes-member-outcry-2019-3 (last accessed September 16, 2020); Exhibit B at ¶ 34.

[15] *See* Natt Garun, *Peloton owners are pissed about bad music after copyright lawsuit*, The Verge (April 24, 2019, 1:47 p.m.), https://www.theverge.com/2019/4/24/18514036/peloton-music-copyright-fitness-studios-gym-on-demand-media-strategy; *see also* Mary Hanbury, *Peloton took down workout classes featuring songs at the center of a $150 million lawsuit, and some users are furious*, Business Insider US (March 27, 2019), https://www.businessinsider.sg/peloton-removes-classes-member-outcry-2019-3/ (last accessed September 16, 2020).

Adele, Lady Gaga, Nicki Minaj, Whitney Houston, Justin Timberlake, Luke Bryan, Mariah Carey, Jay Z, Kanye West, Drake, and Madonna.

39. Foley emailed subscribers and notified them that Peloton was removing classes featuring the allegedly infringing songs, but did not disclose that this would result in removal of over half of the on-demand classes in its digital library or that it would significantly decrease the quality and quantity of popular songs and artists available for its playlists.

40. Instead, Foley falsely promised its subscribers, including Petitioner Simpson, that "[Peloton] can assure you that this will not affect your experience with (or the cost of) [Peloton's] service, or access to the kind of music you're used to hearing behind [Peloton's] instructors in the thousands of classes in [Peloton's] library."

41. That representation, however, is demonstrably false. Peloton never disclosed to its subscribers, including Petitioner Simpson, that it would be removing over half of the classes from its on-demand library.

**D.    Peloton's Misrepresentations and Omissions Are Material to Consumers**

42. Peloton's misrepresentations and omissions are material to Petitioner. As part of Petitioner's subscription, he expected and was entitled to use a class library that, as advertised and represented by Peloton, would continue to grow as new classes were added every day.

43. Each additional on-demand fitness class adds incremental value to Petitioner's subscription and, therefore, Peloton's gutting of its on-demand class library materially lowered the value of his Peloton subscription.

44. Nonetheless, Peloton withheld that information from Petitioner, continued to represent that the on-demand digital library would be "ever-growing," and continued to charge full price for its Subscription Service, despite knowledge that subscribers would not be receiving everything Peloton represented that they would receive.

45. By misrepresenting that its on-demand digital library would be "ever-growing" and failing to disclose the imminent removal of over half of that library, Peloton defrauded Simpson, deprived him of the benefit of their bargain with Peloton, and/or unjustly enriched itself at Simpson's expense.

## VI. THE ARBITRATION

46. Petitioner Brody Simpson filed a demand for Arbitration with the American Arbitration Association on July 19, 2019 against Respondent Peloton Interactive Inc., claiming violations of the Kansas Consumer Protection Act, K.S.A. §§ 50-625, *et seq.*[16]

47. In his Amended Demand, Simpson alleged that Peloton advertised that its subscription-based fitness service included access to an "ever-growing" library of on-demand classes and knew or should have known that it lacked the appropriate copyright license for the music accompanying the classes in its library, and that its library could not legitimately be "ever-growing." Simpson's Amended Demand, attached as Exhibit D hereto.

48. Simpson alleged he saw multiple advertisements on social media and television in June and July 2018, and that as a result of those advertisements he believed that Peloton's on-demand class library would always grow as long as he owned the Peloton bike. In reliance on those representations, Simpson purchased a Peloton Bike, a 39-month subscription, and an accessory package for $4,485.87 on July 6, 2018.

49. Simpson alleged that Peloton's repeated misrepresentations and omissions regarding its service violated Kan. Stat. §§ 50-626(a), (b)(1)(A), (b)(1)(D), (b)(2), and (b)(3).

---

[16] As explained above (*see* Note 1), despite the uniform governing law clause in Peloton's "Terms of Service," the parties to the *Simpson* arbitration stipulated that Kansas substantive law would apply in the context of that arbitration.

Simpson sought statutory damages of $10,000 and attorneys' fees, interest, costs and injunctive relief.

50. Following discovery, an arbitration hearing was held on April 29, 2020 pursuant to the Consumer Rules of the American Arbitration Association. Mr. Simpson appeared in person and through Counsel and presented evidence. Peloton, appeared through a corporate representative, as well as through Counsel and presented evidence. The Parties then submitted post-hearing briefs. Exhibit B at 1.

51. Peloton argued that its representation that its library was "ever-growing" was a true statement, and thus, not a violation of the KCPA, because "ever-growing" really means "ever-changing." Peloton also argued that the phrase "ever-growing" or "growing library" is mere puffery which is not actionable under the KCPA. Peloton also argued that Mr. Simpson's acceptance of the Terms of Service, which permit Peloton to remove or edit its class library, negate any alleged deceptive effect of Peloton's advertising. Exhibit B at 10.

52. Peloton also argued that Simpson was not harmed by Peloton's removal of classes. Exhibit B at 16.

53. The Arbitrator issued her Interim Award on June 23, 2020. In that award, the Arbitrator found that Peloton's on-demand library of fitness classes was an integral part of the Peloton experience, its "special sauce" and as part of its advertisements, Peloton represented its library was "ever-growing" and "growing." Exhibit B at ¶ 3.

54. When Simpson purchased his bike in July 2018, there were already more than ▮ on-demand classes available and Peloton was adding ▮ classes every month. Exhibit B at ¶ 31-32. But, and as discussed above, in March 2019, Peloton removed ▮ of its on-demand classes from its library. Exhibit B at ¶ 34.

55. The Arbitrator also found the "ever-growing" nature of the class library was material and that Simpson would have made a different decision had he known that Peloton's class library would have fewer choices. Exhibit B at ¶ 8.

56. The Arbitrator rejected Peloton's interpretation of "ever-growing" to mean "ever-changing" as incredible. Exhibit B at 10 ("I do not find Peloton's interpretation of the phrase "ever-growing" or "growing library" to mean "ever changing" to be a credible or common sense interpretation, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.") Nor did the Arbitrator believe it to be non-actionable puffery. Instead, the Arbitrator found "ever-growing library" to be Peloton's specific representation, promising that the size of Peloton's class library would continue to grow over time. Exhibit B at 11. The Arbitrator also found that Peloton's Terms of Service do not expressly disavow an "ever-growing" class library excusing Peloton from liability. Exhibit B at 12 ("Peloton's promise of an 'ever-growing' library can be read consistently with its Terms of Service.").

57. The Arbitrator further found that Peloton knew or should have known that it may be forced to remove a significant number of classes from its library. Exhibit B at 14. Finally, the Arbitrator found that Simpson suffered a direct monetary loss as a result of Peloton's actions. Exhibit B at 16. Accordingly, the Arbitrator accessed Peloton damages in the amount of $253.50, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Exhibit B at 17.

58. Simpson filed a petition seeking $117,799.00 in attorneys' fees and $10,739.94 in costs. Peloton filed a response disputing the reasonableness of counsel's rates, hours worked, and costs, and requesting that at most $1,267.50 be awarded in fees and costs and Simpson Replied. Exhibit C at 1.

15

59. On August 25, 2020, the Arbitrator issued a Final Award overruling most of Peloton's objections to Simpson's fee request and awarding $96,597.00 in attorneys' fees and $7,917.82 in costs against Peloton. Exhibit C at 12.

60. The award has not been vacated or modified on any ground.

### VII. REQUEST FOR RELIEF

Petitioner respectfully requests that the Court enter judgment in his favor and against Peloton as follows:

1. Confirming the Arbitrator's Award in all respects and directing that Judgment be entered thereon in this Court for Petitioner and against Peloton in the amount of $253.50 in damages, $96,597.00 in attorneys' fees, and $7,917.82 in costs.

2. Awarding such other and further relief as may be just and proper.

Dated: September 17, 2020

*/s/ Greg G. Gutzler*
GREG G. GUTZLER
ggutzler@dicellolevitt.com
**DiCELLO LEVITT GUTZLER LLC**
444 Madison Avenue, Fourth Floor
New York, New York 10022
Telephone: (646) 933-1000

ADAM J. LEVITT
alevitt@dicellolevitt.com
ADAM PROM*
aprom@dicellolevitt.com
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900

ASHLEY C. KELLER*
ack@kellerlenkner.com
AARON M. ZIGLER
amz@kellerlenkner.com
**KELLER LENKNER LLC**
150 North Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Telephone: (312) 741-5222

*Counsel for Petitioner*

\* *pro hac vice* to be sought