# EXHIBIT B

# Filed Under Seal



Case Number: 01-19-0002-5422

Brody Simpson
-vs-
Peloton Interactive, Inc.

## OPINION AND INTERIM AWARD

Claimant Brody Simpson ("Claimant" or "Mr. Simpson") brought this Arbitration on July 19, 2019 against Respondent Peloton Interactive Inc. ("Respondent" or "Peloton"), claiming violations of the Kansas Consumer Protection Act, K.S.A. § 50-625, *et seq.* ("KCPA"). Specifically, Mr. Simpson asserted that Peloton violated Sections 50-626(a), (b)(1)(A), (b)(1)(D), (b)(2) and (b)(3) of the KCPA. Peloton denied these allegations. Following discovery, an arbitration hearing was held on April 29, 2020 before the undersigned via video conferencing pursuant to the Consumer Rules of the American Arbitration Association. Mr. Simpson appeared in person and through Counsel and presented evidence. Peloton, appeared through a corporate representative, as well as through Counsel and presented evidence.

At the hearing, both parties were afforded full opportunity to call, examine, and cross-examine witnesses, introduce documentary evidence, and present arguments. A transcript of the proceeding was prepared. Following the hearing, the parties submitted post-hearing briefing.

I, Virginia Stevens Crimmins, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing, do hereby issue this INTERIM AWARD as follows:

## FINDINGS OF FACT

### A. Peloton

1. Peloton sells indoor stationary bikes ("Peloton Bike") and treadmills ("Peloton Tread") featuring large, high-definition touch-screen tablets. Consumers who purchase either the Peloton Bike or Peloton Tread may also pay to sign up to receive streamed live and on-demand instructor-led fitness classes from Peloton, featuring Peloton's patented leaderboard technology (the "Peloton Service"). Members who own Peloton Bikes and Treadscan access and participate in these classes from the comfort of their own homes and on their own schedule. For Peloton members who own Peloton Bikes and Treads, the Peloton Service can be purchased on a subscription basis for $39.00 a month.[1]

2. Peloton members receive Peloton's Terms of Service at the time of purchase and when logging into the content library. When Peloton members log into the content library for the

---
[1] *See* April 3, 2020 Stipulated Findings of Fact and Conclusions of Law at p. 1-2 (*hereinafter* "Stipulated Findings").

1

first time, they are presented with a screen that directs them to read Peloton's Terms of Service and asks them to affirmatively agree to the Terms of Service by clicking a button. When Peloton updates its Terms of Service, members receive a notification of the updates and when accessing the content library members must click to accept the new Terms to Service to continue accessing the library.[2]

3. Peloton advertises its products and services on its website, and through social media. Peloton promotes its on-demand library of fitness classes as an integral part of the Peloton experience and offers a variety of classes in its class library, including music classes and scenic rides. This content is Peloton's "special sauce," and as a part of its advertisements, Peloton stated that its library of fitness classes was "ever-growing" and "growing."[3]

4. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5. Obtaining music rights for individual songs in the music classes can be challenging and complex. A single composition can be owned by any number of individuals or entities, and music users must independently determine the rights holders for any given composition.[5]

### B. Mr. Simpson and His Purchase of a Peloton Bike

6. Mr. Simpson, a frequent gym attendee, was looking for a convenient way to work out at home. After seeing advertisements for Peloton, including those promoting Peloton's "ever-growing" and "growing" library of fitness classes, on or about July 6, 2018, Mr. Simpson decided to purchase a Peloton Bike. Mr. Simpson purchased his Peloton products for a variety of reasons, including the convenience of working out at home, the variety of classes and features the Peloton Bike offered, the "look" of the Peloton Bike, and the large interactive screen on the Peloton Bike; however, "the promise of continuing and growing content" was the "biggest" part of his decision. Mr. Simpson understood that the terms "ever-growing" or "growing" library meant that the class library would continue to increase, not decrease, like a growing child. This was important to Mr. Simpson because Peloton was a relatively new company, and he was a picky individual who bored easily and "need[ed] a large library to choose from, . . . [and] based off what [he had] read, . . . [he] would continually have more and more choices . . . ."[6]

7. On or about July 6, 2018, Mr. Simpson purchased a Peloton Bike ($2,225.00), a 39-month prepaid subscription to the Peloton Service ($1,521.00), and "The Works" accessory

---

[2] April 29, 2020 Hearing Transcript at 225:1-226:14 ("Hearing Tr.").

[3] Exhibit J-571; *see also* Exhibit J-470; Hearing Tr. at 55:24-57:5, 60:23-61:13, 165:3-12, 166:7-167:4, 206: 1-7, 282:14-19.

[4] Hearing Tr. at 202:24-203:20.

[5] *Id*. at 174:20-176:1.

[6] *Id*. at 47:17-48:18, 61:3-65:23, 108:8-111:18 148:20-149:11.

2

package ($229.00) plus tax and shipping on Peloton's website on or around July 6, 2018. The total cost of the purchase was $4,485.87, and Mr. Simpson financed the purchase through Affirm, a third party, for 0% APR.[7]

8. Mr. Simpson would have made a different decision regarding the Peloton Bike purchase if he had known that the class library would have fewer choices.[8]

9. After Mr. Simpson purchased his Peloton Bike and subscription, and when he accessed Peloton's content library for the first time, he agreed to Peloton's Terms of Service that was last updated on September 12, 2017 ("2017 Terms of Service").[9]

10. Mr. Simpson is a "consumer" under the KCPA. K.S.A. § 50-624(b). Mr. Simpson's purchase from Peloton is a "consumer transaction" under the KCPA. K.S.A. § 50-624(c). Peloton is a "supplier" under the KCPA. K.S.A. § 50-624(l).[10]

11. During Mr. Simpson's membership, Peloton updated its Terms of Service on September 14, 2018 ("2018 Terms of Service"), and Claimant agreed to the updated Terms of Service to continue to use his subscription.[11]

### C. The Terms of Service

12. The 2017 Terms of Service state in relevant part:

   a. "[Peloton] provides an online fitness community and related products, services, content, and features through the Peloton website located at http://www.onepeloton.com, . . ., the interface on the Peloton bike tablet, Peloton's fitness studios and through mobile and desktop or device applications . . . and Peloton-controlled social media pages . . . (collectively, the 'Peloton Service')."[12]

   b. "Peloton reserves the right to modify the Peloton Service, including, but not limited to updating, adding to, enhancing, modifying, removing or altering any content or features of the Peloton Service, at any time, in its sole discretion."[13]

   c. "Peloton . . . does not guarantee that any content available on the Peloton Service is suitable for all users or that it will continue to be available for any length of

---

[7] *Id.* at 61:3-65:23, 148:20-149:11; *see also* Stipulated Findings at p. 2; Exhibit J-329.

[8] Hearing Tr. at 57:6-12, 62:4-63:6.

[9] Exhibit J-573; Exhibit J-574; Hearing Tr. at 87:12-16, 88:9-89:5.

[10] *See* Stipulated Findings at p. 2-3.

[11] Exhibit J-549; Hearing Tr. at 89:6-9.

[12] Ex. J-574 at p.1.

[13] *Id.* at § 16.

3

time."[14]

    d. "Peloton provides the Peloton Service on an 'AS IS' and 'AS AVAILABLE' basis."[15]

    e. "Without limiting the foregoing, Peloton makes no representations or warranties" regarding the following:

        i. "That the Peloton Service will be uninterrupted or error-free";

        ii. "Concerning any content, including User Content";

        iii. "That Peloton will continue to support any particular feature of the Peloton Service."[16]

    f. "[T]he Peloton Service contains software and other content that is protected by copyrights, patents, trademarks, trade secrets or other proprietary rights, and that these rights are valid and protected in all forms, media and technologies existing now or hereafter developed. All Peloton generated content, and content provided to Peloton by its partners and licensors, is copyrighted individually and/or as a collective work under the U.S. copyright laws . . ."[17]

    g. "Peloton respects the intellectual property of others, and we ask our users to do the same."[18]

    h. An arbitration agreement that allowed members to opt-out when they are first presented with the Terms of Service and when the Terms are amended.[19]

13. The 2018 Terms of Service state in relevant part:

    a. The Peloton Service is "the Peloton Sites and Apps, along with the Peloton tablet and studio interfaces and Peloton-controlled social media pages . . ."[20]

    b. "Peloton reserves the right to modify the Peloton Service, including, but not limited to updating, adding to, enhancing, modifying, removing or altering any Content or

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at § 19.

[18] *Id.* at § 20.

[19] *Id.* at § 21.

[20] Ex. J-549 at p.1.

4

features of the Peloton Service, at any time, in its sole discretion"[21]

c. "Peloton . . . does not guarantee that any Content available on the Peloton Service is suitable for all users or that it will continue to be available for any length of time."[22]

d. "Peloton provides the Peloton Service on an 'AS IS' and 'AS AVAILABLE' basis."[23]

e. "Without limiting the foregoing, Peloton makes no representations or warranties" regarding the following:

   i. "That the Peloton Service will be uninterrupted or error-free";

   ii. "Concerning any Content, including User Content";

   iii. "That Peloton will continue to support any particular feature of the Peloton Service."[24]

f. "[T]he Peloton Service contains software and other content that is protected by copyrights, patents, trademarks, trade secrets or other proprietary rights, and that these rights are valid and protected in all forms, media and technologies existing now or hereafter developed. All Peloton generated content, and content provided to Peloton by its partners and licensors, is copyrighted individually and/or as a collective work under the U.S. copyright laws . . . ."[25]

g. "Peloton respects the intellectual property of others, and we ask our users to do the same."[26]

h. An arbitration agreement that allowed members to opt-out when they are first presented with the Terms of Service and when the Terms are amended.[27]

i. "Because the Peloton Service is evolving over time we may change or discontinue all or any part of the Peloton Service, at any time and without notice, at our sole discretion."[28]

---

[21] *Id.* at § 15.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at § 18.

[26] *Id.* at § 19.

[27] *Id.* at § 20.

[28] *Id.* at § 25.

14. New York Law applies to the Terms of Service between the parties.[29]

15. Kansas law governs Mr. Simpson's substantive KCPA claims.[30]

### D. The Dispute

#### 1. <u>Copyright Dispute</u>

16. On April 9, 2018, Peloton received a cease-and-desist letter from the National Music Publishers Association ("NMPA"), accusing it of copyright infringement in the use of its music in the fitness classes.[31]

17. In response to the letter, Peloton began negotiating with the NMPA and its members. The NMPA never identified specific publishers or compositions that were at issue in their letter. During these negotiations, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[32]

18. Despite the April 2018 cease-and-desist letter, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[33]

19. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[34]

20. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[35]

21. In March 2019, a group of ten music publishers, including Downtown, filed a copyright lawsuit against Peloton. The lawsuit was later amended to include five additional music publishers.[36]

---

[29] *See* Stipulated Findings at p. 2.

[30] *See id.*

[31] Hearing Tr. at 185:16-25; *see also* Exhibit J-969.

[32] Hearing Tr. at 186:1-24, 188:4-25, 190:16-191:10, 191:24-192:2; *see also* Ex. J-969.

[33] Hearing Tr. at 240:17-20.

[34] Exhibit J-971, 974; *see also* Hearing Tr. at 194:9-195:8, 249:4-250:16.

[35] Hearing Tr. at 195:9-196:25, 252:14-22.

[36] Hearing Tr. at 199:4-10.

6

22. On or around March 25, 2019, Peloton removed any class from its content library ███████████████████████████████████████████████████████████.[37]

23. The copyright infringement lawsuit against Peloton was settled in February 2020.[38]

### 2. Mr. Simpson's Usage of His Peloton Bike

24. Mr. Simpson rode his bike twenty-one times before the March 2019 class removals, and four of those classes were instructor-led classes. Mr. Simpson rode thirteen times in his first month after purchasing his Peloton products, and he rode his bike four times in August 2018, and two times in September 2018.[39]

25. Exhibit J-571 is an accurate representation of Mr. Simpson's usage of his Peloton Bike, including which classes he took, from July 9, 2018 through at least July 9, 2019.[40]

26. Mr. Simpson did not ride his bike again for five months, or until February 2019 due to a knee injury.[41]

27. When Mr. Simpson attempted to resume using the Peloton bike in April 2019, he saw a difference in the choices, and could not find a class that interested him.[42]

28. Mr. Simpson tried using the Peloton bike a month later, but was "a little agitated at the time, knowing that this bike that I had spent all this money on and had planned on definitely looking forward to using it for rehab . . .[and] now all of a sudden . . I've got . . . half the choices I had just a month earlier."[43]

29. Mr. Simpson rode the Peloton bike two times in June and one time in July 2019.[44]

30. Mr. Simpson has not used the Peloton bike since August 2019.[45]

---

[37] *Id.* at 206:17-207:12, 254:22-24.

[38] *Id.* at 199:11-14.

[39] *See* Exhibit J-571.

[40] *See* Stipulated Findings at p. 2.

[41] Ex. J-571.; *see also* Hearing Tr. at 71:3-73:14.

[42] Hearing Tr. at 73:9-74:9.

[43] *Id.* at 74:16-24.

[44] *See* Ex. J-571.

[45] Hearing Tr. at 75:4-7.

### 3. **The Peloton Class Library**

31. On July 10, 2018, the date after Mr. Simpson's first ride on the Peloton bike, there were ▮ Fitness Classes available in Peloton's library.[46]

32. In 2018, Peloton added approximately ▮ classes a month.[47]

33. On January 10, 2019, Peloton offered ▮ classes. *See* Exhibit J-334.

34. By March 25, 2019, about ▮ Fitness Classes remained after Peloton removed ▮ Fitness Classes (or ▮% of the library) in response to the litigation.[48]

35. Before the removal of classes in March 2019, and in response to the litigation, ▮:

   a. ▮;

   b. ▮;

   c. ▮;

   d. ▮ and

   e. ▮[49]

36. On or about March 25, 2019, John Foley, the founder and CEO of Peloton, sent an email to Peloton members, including Mr. Simpson, informing them that Peloton had removed a number of fitness classes due to a lawsuit brought against Peloton by a group of music publishers.

---

[46] Exhibit J-333; Hearing Tr. at 253:4-17.

[47] Hearing Tr. at 254:4-17, 256:6-18.

[48] Exhibit J-335; *see also* Hearing Tr. at 206:20-207:15, 254:22-255:22.

[49] Exhibit J-302 (emphasis in original); Hearing Tr. at 260:16-21, 261:18-262:5.

8

The email also stated that the removal of the classes "will not affect your experience with (or the cost of) [Peloton's] service, or access to the kind of music you're used to hearing . . .."[50]

37. Following the March 2019 removal of classes, Peloton continued to add approximately ▮▮▮▮ classes each month. By August 2019, Peloton's content library exceeded ▮▮▮▮ classes through its additions of new content to its library.[51]

38. Although the parties did not identify how many classes were available at the time of the hearing, Peloton estimated that it would have taken it approximately ▮▮▮▮ to return to the largest number of classes that it had offered in ▮▮▮▮.[52]

39. Mr. Simpson seeks the maximum statutory penalty for one violation of the KCPA, or $10,000, in this action.[53]

## CONCLUSIONS OF LAW AND ANALYSIS

The KCPA broadly prohibits "any deceptive act or practice in connection with a consumer transaction," K.S.A. § 50-626(a), and it enumerates a set of *per se* deceptive acts and practices, which are "a violation of [the] act, whether or not any consumer has in fact been misled," including: § 50-626(b)(1)(A) (prohibiting knowing representations that "[p]roperty or services have … characteristics … or quantities that they do not have"); and § 50-626(b)(1)(D) (prohibiting knowing representations that "property or services are of particular standard, [or] quality… if they are of another which differs materially from the representation"). The KCPA is to be "construed liberally" to, among other things, protect consumers from suppliers who commit deceptive and unconscionable practices and protect consumers from non-bargained for warranty disclaimers. K.S.A. § 50-623(b), (c).

In order for the KCPA to be applicable, there must be a consumer and a supplier. K.S.A. § 50-626(a). The parties agreed, and stipulated, that Peloton is a supplier and Mr. Simpson is a consumer under the KCPA. SOF at ¶ 11. The parties' agreement in this arbitration largely ends there and both sides vigorously argue their respective positions, and interpretations of the KCPA.

### I. Representation

In connection with its advertisements, Peloton represented that it had an "ever-growing" or "growing" library of on demand fitness classes. SOF at ¶ 3. Mr. Simpson testified that he heard these advertisements, and a significant reason why he decided to purchase the Peloton bike – as opposed to another stationary bike – is that he believed the fitness class offerings would continue to grow. SOF at ¶¶ 7-9. When Peloton removed ▮▮▮ fitness courses in March 2019, or more than ▮▮% of their entire classes, Mr. Simpson contends that Peloton's promise of an "ever-

---

[50] Exhibit J-304; *see also* Exhibit J-362; Hearing Tr. at 75:8-76:8.

[51] Hearing Tr. at 208:17-209:3, 256:1-5; *see also* Exhibit J-302.

[52] Hearing Tr. at 255:23-25, 256:19-257:1.

[53] *See* Stipulated Findings at p. 2.

9

growing" or "growing" library of on-demand classes was false and/or deceptive. Claimant's Post-Hearing Brief (*hereinafter* "Claimant's Brief").

Peloton disagrees that its statement was false or deceptive for a myriad of reasons. First, Peloton argues that the phrase "ever-growing" is a true statement, and thus, not a violation of the KCPA, because "ever-growing" really means "ever-changing." Second, Peloton argues that the phrase "ever-growing" or "growing library" is mere puffery which is not actionable under the KCPA. And, finally, Peloton argues that Mr. Simpson's acceptance of the Terms of Service, which permit Peloton to remove or edit its class library, negate any alleged deceptive effect of Peloton's advertising. Respondent's Post-Hearing Brief (*hereinafter* "Respondent's Brief").

As an initial matter, there is no dispute that Peloton used the phrase "ever-growing" or "growing library" in its marketing and advertisements. SOF at ¶ 3. There is further no material dispute that Mr. Simpson heard this advertisement. Although Peloton questions the precise date, and timing of when Mr. Simpson heard this statement, I found Mr. Simpson's testimony on the matter to be credible. Mr. Simpson described why a varied and large library of classes was important to him, including that he was easily bored, and that Peloton was a newer company without a long-standing reputation. SOF at ¶¶ 7-9.

### E. Meaning of "Ever-Growing" or "Growing" Library

Despite the fact that Peloton used the phrase "ever-growing" or "growing library," the parties dispute what this language means. Mr. Simpson understood "ever-growing" to mean that after the date of his purchase, the number of classes available to him in the class library would continuously increase, not decrease. He compared this common sense understanding of "ever-growing" to the growth of a child, who "doesn't grow six inches and then lose three and then gain six more." SOF at ¶ 7. On the other hand, Peloton argues that "ever-growing" means ever changing. And, since Peloton is always adding new content at a rate of almost ▌ new classes per month, this is the very definition of an "ever-growing" library. Respondent's Brief at p. 8.

I agree with Mr. Simpson that the plain meaning of the phrase "ever-growing" is "always increase in size." Claimant's Brief at p. 7-8. I do not find Peloton's interpretation of the phrase "ever-growing" or "growing library" to mean "ever changing" to be a credible or common sense interpretation, ▌ ▌ Hearing Tr. at 280:15-282:6. Moreover, Peloton's current actions of adding ▌ classes every month, and adding ▌ classes a month in the 2018 timeframe, support's Mr. Simpson's understanding that Peloton had intended to continually increase its class library. *See* SOF at ¶¶ 33, 38.

### F. Puffery

In addition to a dispute over the meaning, the parties disagree about whether the phrase "ever-growing" or "growing library" is puffery. Peloton argues that the phrase "ever-growing" is vague, and general "puffery" which is not actionable under the KCPA. Respondent's Brief at p. 7-8. Mr. Simpson disagrees and argues that specific representations – that the size of Peloton's class library would continue to grow over time – promises that the library will always increase in size and is easily quantifiable. Claimant's Brief at p. 4-5.

10

Although "claims based upon 'innocent puffing' are not within the purview of the KCPA," puffery refers to a statement that is "subjective in nature and non-specific." *Ormsby v. Imhoff & Assoc., P.C.*, No. 14-2039-RDR, 2014 WL 4248264, at *10 (D. Kan. Aug. 27, 2014). Examples of puffery include a law firm promising that it has "aggressive," the "most effective," and "only the best" attorneys. *Id*. at *8, 10. Conversely, specific representations are not puffery: a law firm promising that its services "would result in [the plaintiff's] release in one year," that the firm would show that the plaintiff "could not legally have been convicted of the crime" charged, and that the firm had "convinced many judges in California to throw out similar cases." *Id*.

Peloton's promise of an "ever-growing library" is not a subjective, non-specific opinion like "only the best." Rather, it is Peloton's specific representation, promising that the size of Peloton's class library would continue to grow over time. Put differently, it was Peloton's promise that its class library would "always" "increase in size," which is the phrase's plain language meaning. Perhaps, most importantly, this statement is quantifiable, and the parties have been able to count and discuss the number of classes removed and added over time. SOF at ¶¶ 32-35, 38-39. Accordingly, because Peloton's library of fitness classes did not constantly increase but rather decreased by over ▮% in March 2019, and it took ▮▮▮▮▮▮▮▮▮▮ before the number of fitness classes available increased to the levels when Mr. Simpson purchased the Peloton Bike and Peloton Service, I find that Peloton's representation was false.

### G. Terms of Service

Even if the representations "ever-growing" and "growing library" were false, Peloton argues that its Terms of Service control. Specifically, Peloton claims that after seeing the advertisements about it is "ever-growing" library of classes, Mr. Simpson was presented with, and accepted, its terms of service. Pursuant to the terms of service, Peloton reserved the right to control its content, including editing and removing classes in its sole discretion. Respondent's Brief at p. 2-6. In response, Mr. Simpson argues, that Peloton's Terms of Service cannot obviate its misconduct under the KCPA because the terms of service can be read consistently with Peloton's representations, and parties cannot waive their rights under the KCPA. Claimant's Brief at p. 7-9.

The Terms of Service agreed to by the parties state, in part, that:

- Peloton could modify, remove or alter any content or features of the Peloton Service with or without notice;

- the Peloton Service contains software and other content that is protected by copyrights,

- All Peloton generated content, and content provided to Peloton by its partners and licensors, is copyrighted individually and/or as a collective work under the U.S. copyright laws; and

- Peloton respects the intellectual property of others, and we ask our users to do the same.

SOF at ¶¶ 13-14. Peloton claims that these terms permit it to remove its classes, including reducing its fitness class content by over ▮%. Respondent's Brief at p. 2-6. However, when these terms

11

are read together, they do not suggest that Mr. Simpson was agreeing to – or could have even imagined – the situation presented here.

The KCPA explicitly provides that "a consumer may not waive or agree to forego rights or benefits under this act." K.S.A. § 50-625(a). "As [the Kansas] Supreme Court has explained, to the extent that a contractual provision waives a consumer's right or benefit provided by the KCPA, K.S.A. 50-625(a) prevents the operation of that contractual provision." *Kansas City Grill Cleaners, LLC v. BBQ Cleaner, LLC*, 454 P.3d 608, 612 (Kan. Ct. App. 2019). Courts have found, however, that subsequent disclosures or representations can negate or minimize the impact of a misrepresentation.

For example, in *Crandall v. Grbic*, the plaintiffs entered into a contract for the purchase of a home. *Crandall v. Grbic*, 36 Kan. App. 2d 179, 181, 138 P.3d 365, 369 (Kan. App. 2006). In the disclosure statement, the sellers advised, among other things, that "to their knowledge, there were no present or past roof leaks; the roof had not been repaired by them; and no insurance claim had been submitted based on the roof in the past 5 years." *Id*. The disclosure statement also advised the plaintiffs of the need for an inspection. *Id.* Following receipt of the disclosure statement, the plaintiffs did have the property inspected. The inspector noted issues with the roof, including that it was "nearing the end of its life expectancy," had "damage on one side" and advised further investigation into a part of the roof. *Id.* at 182. In affirming a grant of summary judgment to the defendant, the Kansas appellate court noted that "the fact the potential for problems with the patio roof was mentioned in numerous places on the house inspector's report effectively precludes any claim under the KCPA. Defendant did not deceive plaintiffs in any of the ways listed in the statute." *Id.* at 196.

Similarly, *in Schweizer v. DEKALB Swine Breeders, Inc.*, 954 F. Supp. 1495 (D. Kan. 1997), buyers of hogs brought a claim against the breeder/seller alleging that sales representative of the seller had represented that the seller would advise buyers if the hogs were experiencing any illness, that the hogs had tested negative for PRRV (a type of viral infection), and that if an outbreak developed the seller would not sell the hogs. *Id.* at 1502. The Court found that these alleged representations were not sufficient to state a claim under the KCPA because the contract between the parties expressly stated that PRRV had been detected in the heard. Moreover, the contract in *Schweizer*, offered the buyer an opportunity to test the hogs for illness, and contained a box which permitted the buyer to list any other promises or representations which had been made by a sales person to a buyer. *Id.* at 1497. Not only did the buyers decline to have the hogs tested but in the box asking for any additional representations or statements, the buyers wrote "none." *Id.*

Here, unlike the situations in *Crandall* or *Schweizer,* Peloton's terms of service do not expressly disavow an "ever-growing" class library.[54] And, Peloton's promise of an "ever-growing" library can be read consistently with its Terms of Service. As argued by Mr. Simpson, Peloton could remove any class it wanted but could add additional classes to ensure that its library

---

[54] Additionally, Peloton's terms of service, do not contain some of the other protections set forth in *Schweizer*. For example, Peloton's terms of service do not ask its customers if there are other representations or statements the customer is relying upon in the sales process.

12

was "ever-growing." Claimant's Brief at p. 7-8. Although, as Peloton now argues, this is not what it intended, Mr. Simpson's reading is not unreasonable.

Nor do the terms of service put Mr. Simpson on notice that he needs to further investigate or question Peloton's representation about its "ever-growing" library. When the entirety of the document is viewed in context, nothing in the Terms of Service forewarned Mr. Simpson that Peloton would remove ▮▮▮ classes due to alleged copyright infringement. Rather, the Terms of Service state that Peloton was fully compliant with copyright law, explaining that Peloton's class library contains copywritten content, and noting that "Peloton respects the intellectual property of others ..." SOF at ¶¶ 13-14.

When the "ever-growing library" representation is paired with the copyright language, the net impression is that Peloton's class library will not be materially reduced due to copyright infringement issues. As such, I do not find anything in the contract that should clue Mr. Simpson into the fact that Peloton was not going to honor its statement that it had an ever-growing class library. On the contrary, I find the evidence to suggest that Peloton did intend to have an ever-growing class library, which was its "special sauce"; however, its plans came to a screeching stop when it was faced with copyright litigation. SOF at ¶¶ 33-38. Peloton's terms of service do not negate the deceptive effect on its misrepresentation.

## II. MATERIALITY

"A material fact is 'one to which a reasonable person would attach importance in determining his or her choice of action in the transaction involved.'" *Tufts v. Newmar Corp.*, 53 F. Supp. 2d 1171, 1178 (D. Kan. 1999) (*quoting York v. InTrust Bank, N.A.*, 962 P.2d 405, 420 (Kan. 1998)). Claims arising under the KCPA, Sections 50-626(b)(2) and (b)(3) require a showing of materiality.[55]

Applying the reasonable person standard, I do find that a reasonable person would attach importance to the "ever-growing" nature of Peloton's fitness class library when determining whether to purchase Peloton's products. This is particularly material in this case where the consumer was contemplating purchasing a 39-month pre-paid subscription to the tune of $1,521.00 for a product and to a company that were relatively new. SOF at ¶¶ 7-8. If a person was going to pre-pay for more than two years of services, it is imminently reasonable that one would want confirmation that the service would continue to grow – not dramatically shrink – over the next 39-months.

Mr. Simpson's objective testimony also confirms the materiality of the statement. The "ever-growing library" was not only an "important" feature in Simpson's purchase decision; the promise of growing content was the "biggest" part of his decision because he knew he would need more choices to keep him motivated. SOF at ¶ 7. In addition, Mr. Simpson testified that Peloton was a new company, and he attached importance to the representations. *Id*. I find the element of materiality has been met by Mr. Simpson.

---

[55] Claims arising under KCPA Sections 50-626(b)(1)(A) and (b)(1)(D) do not require materiality.

### III. KNOWLEDGE AND WILFULLNESS

Depending upon the section of the statute, to prevail under the KCPA, a consumer must make a showing that the supplier knew or had reason to know that his misrepresentation was false or that the supplier willfully made or omitted a material misrepresentation of fact. "The mental state required to prove a violation of K.S.A. 50-626(b)(1) [of the KCPA] ('knowingly or with reason to know') is a more forgiving standard for consumers than the willfulness requirement under K.S.A. 50-626(b)(2) or (b)(3)." *CitiMortgage, Inc. v. White*, 435 P.3d 1184, 2019 WL 1213177, *1 (Kan. Ct. App. 2019), review denied (Dec. 19, 2019) (*quoting Via Christi Regional Med. Center, Inc. v. Reed*, 298 Kan. 503, 521, 314 P.3d 852 (2013)).

#### A. Knowledge.

To state a claim for a violation under KCPA, Sections 50-626(b)(1)(A) or (b)(1)(D), a consumer must show that the supplier "knew or should have known" that it misrepresented the characteristics, properties, standard or quality of its specific property or service, in this case, Peloton's fitness class library.

Mr. Simpson argues that Peloton knew or should have known that its on demand library of classes was not "ever growing" or growing due to the copyright concerns. Specifically, Mr. Simpson argues that Peloton promised an "ever-growing library" and copyright compliance after ███████████████████████████████████████████. As a result, Peloton knew or should have known that copyright infringement allegations could lead to a large removal of classes resulting in a shrinking rather than growing library. Claimant's Brief at p. 8-9.

Peloton, on the other hand, argues similar to what is set out above that its statements really meant "ever changing" and that ████████████████████████████████████████████████████████████████████████ For the same reasons set forth above, I do not find Peloton's interpretation of the phrase "ever growing" to be particularly convincing.

Peloton also argues that ████████████████████████████ ███████ so it could not have known that these alleged violations would result in a shrinking class library. I am also not persuaded by this argument. As an initial matter, the evidence states that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The evidence supports that Peloton had some idea of the infringing compositions. ████████████████████████████████████████ There is no question that Peloton knew or should have known that it needed to address copyright issues, as is evidenced by the fact that it represents it has copyright licenses on its classes in its Terms of Service. Sloppy record keeping does not justify a finding that a supplier did not know or should not have known. The complex nature of the copyright licensing business, ████████████████████████ ████████████████████████████████ should have put Peloton on notice that it could have a situation where it was going to be forced to remove a significant number of classes resulting in a shrinking – not growing – library.

14

### B. Willfulness

In order to state a claim for a violation under KCPA, Sections K.S.A. 50-626(b)(2) or (b)(3), a consumer must show that the supplier intentionally or purposefully acted with an intent to harm the consumer. *CitiMortgage*, 2019 WL 1213177 at * 12 (*citing Unruh v. Purina Mills, LLC,* 289 Kan. 1185, 1194-95, 221 P.3d 1130, (Kan. 2009)).

Peloton argues that it did not act willfully because it acted within industry norms, and customs. Mr. Aronow, who had considerable experience in the music industry, credibly testified that █████████████████████████████████████████████████████████████████████████████████████████████████████████. Peloton's Brief at p. 9. Mr. Simpson disagrees and argues that Peloton knew of the potential copyright dispute at the time the misrepresentation was made, and ████████████████████████████████████████████████████████████████████████████████████████████████. *See* Claimant's Post Hearing Brief at p. 10.

Although there is no question that █████████████████████████████████████████████████████████████████████████████████████████████ there was no evidence to suggest that at the time Peloton made the misrepresentation to Mr. Simpson, Peloton was engaged in an intentional scheme to deceive consumers. █████████████ SOF at ¶¶ 6, 18. And, the evidence supports that ███████████████████████████████████████████████ *See* SOF at ¶¶ 38-39.

Mr. Simpson's argument that Peloton's intent to harm consumers is evidenced by letters written to Mr. Simpson, and others, as well as ████████████████████ is not persuasive. By the time ███████████████████████████████████████████████████████████ and issued its letters to customers and ████████████████████████, Peloton was embroiled in litigation over the copyrights. I found Mr. Aronow's testimony to be credible when he explained that ███████████████████████████████████████████████████████████████████████████████████████████████ SOF at ¶ 35. Again, while perhaps one could second guess these statements with the 20/20 vision of hindsight, the evidence shows that Peloton had a good-faith business decision for its actions. And, there was no evidence presented that this was part of a greater conspiracy or plan to harm the consumer.

On the contrary, I find that the evidence shows, at best, that Peloton was sloppy or made a bad business decision that caught up with it; however, since this issue Peloton has been working to increase its class library to the point that it now exceeds the number of classes available at the time Mr. Simpson purchased the product. SOF at ¶¶ 38-39. As such, I find in favor of Peloton on Mr. Simpson's claims under KSA § 50-626(b)(2) and (b)(3).

### IV. AGGREIVED CONSUMER

"[A] consumer is not automatically entitled to § 50–634 remedies under the KCPA each time a supplier violates the Act. Instead, the consumer must demonstrate that the violation was

15

causally connected to the consumer's damages to be entitled to these remedies." *Finstad v. Washburn Univ. of Topeka*, 252 Kan. 465, 845 P.2d 685 (1993). The term "aggrieved" was defined by the Kansas Supreme Court as "[h]aving suffered loss or injury. *Id.* at 690.[56] "A consumer may be aggrieved under the KCPA without having suffered a direct monetary loss; acting on a statutorily defined deceptive or unconscionable practice to select a provider of covered goods or services may be enough." *See Florez v. Ginsberg*, 57 Kan. App. 2d 207, 216, 449 P.3d 770, 777–78 (Kan. App. 2019) (*quoting Via Christi Regional Med. Center, Inc. v. Reed,* 298 Kan. 503, 519, 314 P.3d 852 (Kan. 2013)).

The parties dispute whether Mr. Simpson is an aggrieved party. Mr. Simpson argues that after the class removals, and his knee improved, when he went to ride the bike he saw a difference in his class choices and could not find classes that he liked. He also argues that if he had known Peloton ████████████████, and as a result, the promise of an "ever-growing" library was undermined, he would not have purchased the Peloton bike. Claimant's Brief at p. 6-7.

Peloton argues that Mr. Simpson was not an aggrieved consumer but one who simply had buyer's remorse. After purchasing the product – for a variety of reasons besides Peloton's "ever-growing library" – Mr. Simpson barely used the product. Mr. Simpson had access to thousands of thousands of classes and admitted that he did not scroll through all of the classes, nor did he compare the classes. Respondent's Brief at p. 6-7.

Although this is a close call, given the broad remedial purposes of the KCPA, I find that Mr. Simpson is an aggrieved consumer. I found Mr. Simpson's testimony credible that he found a difference in the class library, and that Peloton's representation of an "ever-growing" or "growing library" was the biggest influence in his decision and that he would not have purchased the license if he knew that the class library was not ever growing, or that ████████████ ████████████████████████████████████████ resulting in a significant reduction of the class library.

## V. DAMAGES

An aggrieved consumer may recover a civil penalty, "in a sum set by the court of not more than $10,000.00" as well as reasonable attorneys' fees. *See* KSA § 50-634(b) and (e): *see also* KSA§ 50-636 (a).

### A. Civil Penalty

The civil penalty is designed to be "remedial, rather than punitive in nature." *Maberry v. Said*, 927 F. Supp. 1456, 1463 (D. Kan. 1996) (quoting *Equitable Life Leasing Corp. v. Abbick*, 243 Kan. 513, 517, 757 P.2d 304, 307 (1988)).

---

[56] Under the KCPA, reliance is not an element. *See Cole v. Hewlett Packard Co.*, 84 P.3d 1047, 1047 ("[A] plaintiff is not required to prove reliance under the KCPA to establish that the defendant engaged in deceptive acts."); *Midland Pizza, LLC v. Sw. Bell Tel. Co.*, No. 10-cv-2219, 2010 WL 4622191 at *2 (D. Kan. Nov. 5, 2010) ("One of the important things about the [KCPA] is that reliance upon the deceptive act or practice is not required.").

16

When examining all of the facts, there is no doubt in my mind that Peloton intended to grow its class library as its course selection was its "special sauce." There is also no doubt in my mind that Mr. Simpson relied upon this feature – an "ever-growing" class library – in his decision to purchase a Peloton. However, an award of $10,000 would be punitive under these circumstances. Although Peloton should have known that its actions could have resulted in the removal of more than half of its class-library, there was no evidence that Peloton acted with an intent to harm its customers. On the contrary, Peloton has acted promptly to resolve any harm that its actions caused by increasing production of classes and returning its class library to its pre-March 2019 size ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SOF at ¶ 38-39. Mr. Simpson did not contradict this evidence. Although Mr. Simpson testified he was "agitated" by the situation, he has received the benefit of his bargain for more months than he has not, even if he has opted not to utilize the service. As such, I am awarding Mr. Simpson an amount of $253.50 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

### B. Attorneys' Fees

Under the KCPA, "the court may award to the prevailing party reasonable attorneys' fees . . . if . . . a supplier has committed an act or practice that violates this act and the prevailing party is the consumer; and, an action under this section has been terminated by a judgment." K.S.A. § 50-634(e). Although the parties submitted some briefing on this matter, Respondent objected to this submission for a variety of reasons, including that it expanded Claimant's page limit, Claimant's counsel has not provided the undersigned with its billing records and Claimant's counsel's rates exceeded the market rates. *See* May 14, 2020 Objection to Request for Fees and Costs. Claimant replied to Respondent's submission and objected to Respondent's submission, in part, on the grounds that it was untimely, and that Respondent should be compelled to produce its billing rates/records if it was going to contest Claimant's counsel's fee application. *See* May 15, 2020 Email from Mr. Prom. In this correspondence, Claimant noted its offer to submit its billing records *in camera*. *Id.* Respondent further objected, including to the *in camera* review of records which would deny Respondent of the opportunity to fully evaluate a fee request. *See* May 15, 2020 Email from Mr. Feldman.

In the November 12, 2019 Scheduling Order, "the parties agreed that a decision on an award of attorneys' fees will be made after a decision on liability." *See* Nov. 12, 2019 Order at ¶ 8(c); *see also* Second Amended Scheduling Order at ¶ 4 ("unless otherwise amended herein, all other deadlines and orders set forth in the November 12, 2019 Scheduling order continue and remain in effect). As there appears to be some confusion as to when this briefing was due, I shall require that if Claimant wishes to pursue his claims for attorneys' fees, he must file an application for fees, together with all supporting material, including billing records, within fourteen days of this Interim Award. Billing records shall be produced to Respondent; however, any information contained in the billing records which Claimant contends is privileged, may be redacted. If Respondent objects to any of the redactions, said redactions will be subject to an in-camera review by the undersigned. Respondent shall then have fourteen days to respond to this fee application. If Respondent wishes to contest the hourly rates submitted by Claimant's counsel, Respondent's counsel should provide their own billing rates used in defense of this matter. Claimant shall have seven days to file a reply. No other filings on the question of attorneys' fees shall be permitted except for leave of the arbitrator and for good cause shown.

17

**INTERIM AWARD**

1.	Claimant Brody Simpson is awarded $253.50 against Respondent Peloton Interactive, Inc.

2.	This Interim Award is in full settlement of the merits of all claims submitted to this Arbitration, except for the determination of reasonable attorney fees and costs in favor of Claimant Brody Simpson as set forth above. The Arbitrator retains jurisdiction to address Claimant's claims for reasonable attorney fees and costs.  If Claimant wishes to pursue his claims for attorneys' fees, he must file an application for fees, together with all supporting material, including billing records, within fourteen days of this Interim Award.  Respondent shall then have fourteen days to respond to this fee application.  Claimant shall have seven days to file a reply.  No other filings on the question of attorneys' fees shall be permitted except for leave of the arbitrator and for good cause shown.  Upon and after such submissions, the matter shall be deemed submitted to the Arbitrator for determination of a Final Award.

3.	This Interim Award shall remain in full force and effect until the Arbitrator renders a Final Award.


Date:   June 23, 2020                                                    *Virginia Stevens Crimmins*
                                                                         Virginia I. Stevens Crimmins, Arbitrator

18